NOT FOR PUBLICATION                    (Docket No. 12, 13, 19)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____  :
                                :
JOAN REICHERT,                  :
                                :
                                :
            Plaintiff,          :    Civil No. 05-2518 (RBK)
                                :
        v.                      :    **OPINION**
                                :
LIBERTY LIFE ASSURANCE          :
COMPANY OF BOSTON,              :
                                :
            Defendant.          :
_____  :


**KUGLER**, United States District Judge:

    Before the Court are motions by Defendant Liberty Life
Assurance Company of Boston to strike Plaintiff Joan Reichert's
"undated certification" and the August 11, 2006 certification of
her attorney submitted in opposition to Defendant's motion for
summary judgment, and Plaintiff's counsel's July 6, 2006
certification, submitted in support of Plaintiff's motion for
summary judgment, from the record, as well as cross motions for
summary judgment.  For the reasons provided below, Liberty's
motion to strike will be granted; Plaintiff's motion for summary
judgment will be denied; Liberty's motion for summary judgment
with regard to review of the adverse benefits determination will
be granted; Liberty's motion for summary judgment with regard to

reimbursement of the overpayment of funds will be denied.

## I.   Background

Plaintiff Joan Reichert ("Plaintiff") worked for Holman Enterprises ("Holman") as an Assistant Controller.  Through her employment with Holman, Plaintiff was the beneficiary of a group long-term disability ("LTD") insurance policy with Liberty Life Assurance Company of Boston ("Liberty").  Plaintiff left her position with Holman in April 2003 and filed a claim for short-term disability ("STD") benefits, also with Liberty.  On her STD claim form, Plaintiff alleged that she became disabled on April 3, 2003, as the result of "mental stress due to increased work, hours and management pressures" and "stress of divorce and abuse" but made no reference to chronic pain or a physical impairment.  In this claim form, Plaintiff stated that her treating doctors were Drs. Higgins and Ball.  On April 9, 2003, Dr. Higgins submitted an "Attending Physician's Statement" to support Plaintiff's claim for STD benefits.  In that statement, Dr. Higgins diagnosed Plaintiff with depression.  This statement did not mention any physical impairments.  In addition, Dr. Ball, Plaintiff's osteopathic clinician, also reported that Plaintiff complained of work-related stress.  Dr. Ball also diagnosed Plaintiff as suffering from depression.  After reviewing the evaluations from Drs. Higgins and Ball, Liberty approved Plaintiff's claim for short-term disability ("STD").  Moreover,

Liberty referred Plaintiff's medical records to Dr. Oakes, a
Board-certified neuropsychologist, for an independent medical
review.  Dr. Oakes confirmed the diagnosis of depression, and
estimated a recovery time of four to six weeks.  Liberty paid
Plaintiff STD benefits for six months.

Near the end of Plaintiff's STD benefits, Liberty received a
certification, dated August 8, 2003, from Plaintiff's "then-
treating physician," Dr. Laurie Peterson-Deerfield.  Dr.
Deerfield stated that Plaintiff still complained of stress
related to her living situation and to her work.  Dr. Deerfield
reported that at that time, Plaintiff cared for her son and
sister, and Plaintiff reported that her supervisor "wrote her up"
in January 2003 for her "attitude."

Prior to the end of Plaintiff's STD benefits, Liberty
evaluated Plaintiff's claim under the LTD policy.  On September
10, 2003, a Liberty case manager interviewed Plaintiff on the
phone, at which time Plaintiff informed Liberty that Plaintiff
was under the care of Drs. Deerfield, Colis (a psychologist), and
Corda (a pain management specialist).  Liberty then attempted to
collect medical records from these physicians to further evaluate
Plaintiff's claim for LTD benefits.

During this evaluation, Liberty referred to a Physical Job
Evaluation Form that Holman provided in connection with
Plaintiff's claim for benefits.  This form stated that

3

Plaintiff's occupation was sedentary in nature and entailed, on a daily basis, seven hours of sitting, .65 hours of standing, .25 hours of walking, .05 hours of pulling and minimal lifting. Liberty compared this description with the United States Department of Labor's Occupational Description for Plaintiff's occupation, and confirmed that Holman's description was accurate.

Liberty requested records from Plaintiff's treating physicians. Dr. Higgins's records reflected that he treated Plaintiff on September 22, 2003, which is during the time Plaintiff received STD benefits for a mental impairment. Dr. Higgins treated Plaintiff for an arm sprain, an ankle sprain, and facial lacerations she suffered when she fell "while running." Dr. Higgins's notes also reflect that Plaintiff had periodic back and neck pain from a spinal fusion she had several years ago following a 1983 car accident, and that this pain was treatable with pain medication.

Dr. Colis's medical records reflected that Plaintiff complained of an inability to concentrate. Dr. Colis's evaluation also stated that Plaintiff indicated she could perform the "activities of daily living,"[1] but Plaintiff stated she could not

---

[1]     Liberty states that "Activities of Daily Living" is a term of art in the context of disability benefits.  Liberty defines "Activities of Daily Living" as encompassing a number of activities, including, but not limited to, grocery shopping, cooking meals, housekeeping, doing laundry, and engaging in personal grooming and hygiene.

4

engage in occupational tasks.  Dr. Colis diagnosed Plaintiff with
depression, and recommended weekly behavioral therapy.  Moreover,
Dr. Colis recommended that Plaintiff return to work within three
months.  Dr. Colis also noted that while Plaintiff received STD
benefits, she actively sought other employment.

Dr. Deerfield's notes showed that Plaintiff reported being
depressed and having trouble concentrating.  Similar to Dr.
Colis, Dr. Deerfield noted that Plaintiff could engage in the
activities of daily living, but that Plaintiff stated she could
not engage in occupational tasks.  Dr. Deerfield diagnosed
Plaintiff as having bipolar disorder, not depression, and
recommended therapy and medication.

In addition, Liberty requested information directly from
Plaintiff in a variety of forms.  Through these forms, Plaintiff
reported a disability claim based on a mental impairment, and
further indicated that Plaintiff remained physically active,
including "dog training" activities one day a week, volunteer
work at Children's Hospital in Philadelphia, and the activities
of daily living, with the exception of carrying groceries and
doing laundry.

On October 29, 2003, a Liberty case manager handling
Plaintiff's claim referred the file to Liberty's "MDS Unit,"
which is a "unit of registered nurses and consulting physicians
who serve as a resource to disability case managers on medical

issues."  The MDS Unit completed its assessment of Plaintiff's
claim on November 5, 2003.  In that assessment, the registered
nurse assigned to the file concluded that the medical records
from Plaintiff's treating physicians supported the diagnosis of a
mental impairment.  The registered nurse further stated that
Plaintiff's diagnosis changed from depression to bipolar
disorder, and that because Plaintiff's medication changed,
Liberty could expect a "lengthier recuperation," consistent with
Dr. Colis's recommendation that Plaintiff return to work in three
months.  The Registered Nurse also stated that if Plaintiff
complied with her prescribed psychiatric treatment, she should be
able to resume work.

On November 3, 2003, Liberty approved Plaintiff's claim for
LTD benefits for a duration of three months, commiserate with the
doctors' prediction regarding Plaintiff's recuperation.

After Liberty awarded LTD benefits, Liberty received a form
back from Dr. Corda, who Plaintiff identified as her "pain
manager."  In the evaluation, Dr. Corda stated that Plaintiff was
not restricted in her ability to sit, stand occasionally, stand,
walk, squat, bend, kneel, push, pull, reach, and lift less than
ten pounds frequently.  However, Dr. Corda stated that Plaintiff
could not "climb or grasp."  Given this information, and
Plaintiff's job description, Liberty continued to believe that
Plaintiff was disabled due to her mental impairment, but that

Plaintiff was not physically unable to perform her job.

On January 14, 2004, near the end of her three month disability period, Liberty contacted Plaintiff to inquire about her condition. Plaintiff reported that she was no longer under the care of Dr. Colis, but that Drs. Corda and Deerfield still treated her.  As a result, Liberty sent requests to Drs. Corda and Deerfield, seeking Plaintiff's medical records.  Liberty also sent a request to Dr. Colis, even though Plaintiff indicated she discontinued treatment with Dr. Colis.

Liberty received reports from Drs. Corda and Deerfield, but received nothing further from Dr. Colis.  Dr. Corda's records again referenced Plaintiff's spinal fusion and ongoing treatment for pain in her neck and back.  However, Liberty concluded that Dr. Corda's records were silent with regard to any resulting physical limitations as a result of this injury and subsequent surgery and treatment.  In subsequent correspondence, Dr. Corda indicated that Plaintiff responded to treatment, and referenced Plaintiff's vacation in Florida, where she parasailed and rode roller coasters, albeit with some back pain.

Dr. Deerfield initially submitted only a Functional Mental Status Evaluation with no supporting records or notes.  In that evaluation, Dr. Deerfield indicated that her ongoing diagnosis was bipolar disorder. However, on February 23, 2004, Liberty notified Plaintiff via letter that because Liberty did not

7

receive all of the updated records it requested from her treating
doctors, which were necessary for Liberty to assess Plaintiff's
ongoing eligibility for LTD benefits, Liberty suspended her claim
file.

After Liberty's letter to Plaintiff, Liberty received
additional documentation from Dr. Deerfield. That documentation
further demonstrated Dr. Deerfield's diagnosis of bipolar
disorder, and Dr. Deerfield's opinion that Plaintiff should
continue with her course of medication.  Moreover, Dr. Deerfield
noted that Plaintiff continued to complain of back and neck pain,
but that Plaintiff indicated that the treatment she received for
that pain alleviated it somewhat.

Upon receipt of Dr. Deerfield's additional documentation,
Liberty referred the case file to a psychiatrist, Dr. Schroeder,
for independent psychiatric review.  Dr. Schroeder concluded that
although Plaintiff unquestionably suffered from a mental
impairment, it was not so severe as to prevent her from
performing the "material and substantial duties of her sedentary
occupation."  Dr. Schroeder further noted the absence of severe
psychiatric symptoms, such as suicidal or homicidal thoughts,
manic symptoms, or severe disorders of thought, cognition, or
perception. Dr. Schroeder also noted that although Plaintiff
allegedly suffered from problems with concentration, the medical
records were unclear as to whether those problems were self-

reported by Plaintiff or if there was objective medical evidence. Dr. Schroeder also noted that Plaintiff had "significant functionality during her absence from work." Dr. Schroeder also opined that Plaintiff's absence from work was avoidance of her job rather than a result of her mental impairment.

On April 23, 2004, Liberty cancelled Plaintiff's LTD benefits. According to Liberty, the reason for the cancellation was Dr. Schroeder's report and "the lack of any medical evidence" to indicate that Plaintiff's mental impairment prevented her from performing her sedentary job.  Moreover, Liberty states that there was ample evidence in the medical records to "belie" any claim of a physical impairment.  Liberty notified Plaintiff of their decision in writing.  The letter explained that Plaintiff's reported restrictions were subjective, and not backed by any objective clinical evidence, and that the evidence demonstrated that Plaintiff had significant physical functionality during her disability.  Finally, Liberty advised Plaintiff of her right to appeal.

On May 28, 2004, Plaintiff responded to Liberty in writing, alleging "great difficulty sitting or standing for longer than one hour or two" and "difficulty performing household chores." Plaintiff also denied taking care of a mentally disabled sibling, training dogs, or seeking employment during her disability period.  Upon receipt of this correspondence from Plaintiff,

9

Liberty again referred her case file to an outside physician, Dr.
Hacobian.  Liberty asked Dr. Hacobian to review the file and
identify any physical restrictions that should be placed on
Plaintiff as a result of her alleged disabling conditions. Dr.
Hacobian provided Liberty with a report that summarized
Plaintiff's medical records, in which he stated that given her
back problems, Plaintiff may require limitations on her ability
to sit.  Dr. Hacobian was not specific in his proposed
limitations, but said that Plaintiff would require "frequent
breaks," and that she would need to "change positions as desired
for comfort."

     After receiving Dr. Hacobian's report, Liberty ordered a
labor market study to determine whether "Plaintiff's sedentary
occupation with Holman existed in the national economy and
allowed for Plaintiff's physical restrictions."  The study
concluded that those occupations exist.

     Liberty again wrote to Plaintiff on September 22, 2004, and
advised her that they would deny her LTD benefits based on her
claim of physical impairment.  Liberty concluded that Plaintiff
did not produce sufficient evidence that her physical impairment
precluded her from performing the material and substantial duties
of her occupation.  Plaintiff requested an appeal, but submitted
no further evidence.  However, on September 30, 2004, Liberty
received a letter from Dr. Corda, in which the doctor stated that

Plaintiff was totally disabled and that she could not sit for more than 15 minutes at a time without extreme pain.  Dr. Corda did not attach any records to this letter.

On October 14, 2004, Liberty notified Plaintiff that Liberty referred her file to the Appeal Review Unit.  Liberty also referred the case to Dr. Marion for independent peer review.  Dr. Marion concluded that Plaintiff has lumbar disc disease, and that she required restrictions on her lifting, standing, and walking.  Dr. Marion did not place any restrictions on Plaintiff's ability to sit.  Dr. Marion concluded, after speaking with Dr. Corda by phone, that there was no objective evidence to support Plaintiff's claim of impairment that would preclude her from returning to her sedentary job. On December 1, 2004, Liberty issued a final determination in which it upheld its earlier decision to discontinue Plaintiff's LTD benefits.

In addition, Plaintiff's LTD policy contains a provision that permits Liberty to reduce LTD benefits by its estimate of the monthly Social Security Disability Income ("SSDI") benefits a claimant receives.  A claimant may receive full LTD benefits from Liberty on the condition that the claimant reimburse Liberty for overpayment that results if and when the claimant receives benefits from SSDI.

Liberty alleges that it paid full LTD benefits to Plaintiff in the amount of $3,938.99 per month between October 1, 2003 and

February 13, 2004.  Liberty later learned that Plaintiff received retroactive SSDI benefits in the amount of $19,612.00, which included monthly benefits of $1,594.80, during October, November and December, as well as a monthly benefit of $1,610.00 during January and February of 2004.  Therefore, Liberty contends it overpaid Plaintiff in the amount of $7,089.67, which is equivalent to the amount of SSDI benefits Plaintiff received during the time she received LTD benefits.  Liberty alleges that it wrote to Plaintiff on multiple occasions seeking reimbursement, but that Plaintiff refuses to reimburse Liberty for the overpayment.

Plaintiff filed a Complaint in United States District Court for the District of New Jersey on May 10, 2005.  Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., permits claimants to bring a civil action following an adverse benefits determination.  On June 24, 2005, Liberty filed a counterclaim against Plaintiff, seeking reimbursement of overpaid LTD benefits, totaling $7,089.67 before interest, resulting from Plaintiff's receipt of retroactive SSDI benefits.  On July 7, 2006, both Plaintiff and Liberty moved for summary judgment. On August 18, 2006, Liberty moved to strike some of Plaintiff's certifications submitted on summary judgment.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II.  Discussion

A.   Standard of Review

Generally, courts review decisions of ERISA plan administrators de novo. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). However, when the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, courts apply an arbitrary and capricious standard of review. Id. at 45. The Third Circuit stated that when an insurance company both funds and administers benefits, it is generally acting under a conflict of interest, and the reviewing court should review its decision to deny benefits under a heightened form of the arbitrary and capricious standard of review. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000). The reviewing court should apply the arbitrary and capricious standard of review on a sliding scale basis, intensifying the degree of scrutiny to match the degree of the conflict. Id. This standard of review permits the court to note discrete factors that suggest a conflict influenced the administrator's decision. Id. at 378. "Suspicious events" and "procedural anomalies" raise the likelihood of self-dealing and warrant more intense review, in the higher range of the "sliding scale" of the heightened arbitrary and capricious standard. Id. at 394. The claimant carries the burden of proof to demonstrate that a plan administrator's actions warrant a heightened standard of review. Marciniak v. Prudential Fin. Ins.

13

<u>Co. of Am.</u>, 184 F. App'x 266, 268 (3d Cir. 2006) (citing <u>Schlegel</u> <u>v. Life Ins. Co. of N. Am.</u>, 269 F. Supp. 2d 612, 617 (E.D. Pa. 2003).

In this case, Plaintiff first argues that this Court should review Liberty's denial of Plaintiff's claim for LTD benefits de novo.  Plaintiff cites two New Jersey statutes, N.J.S.A. §§ 17B:26-1(h)(2) and 17B:27-49(g), as permitting the New Jersey Department of Banking and Insurance to "disallow . . . group health insurance forms on the basis that they are 'unjust, unfair, inequitable, misleading, contrary to law or to the public policy of this State.'" (Pl.'s Br. Supp. Pl.'s Mot. Summ. J. at 18.) This argument is contrary to a published opinion directly on point in this District.  <u>Sarlo v. Broadspire Services, Inc.</u>, 439 F. Supp. 2d 345, 357 n.11 (D.N.J. 2006) (rejecting plaintiff's argument that N.J.S.A. § 17B:27-49 voids the clause of the LTD plan at issue that gave the plan administrator "full discretion and authority" to "interpret all policy terms and conditions" because, among other reasons, nothing in the language of the statute actually voided the discretionary clause of the Plan at issue).  The other statute Plaintiff cites is N.J.S.A. § 17B:26-1(h)(2), which is completely inapposite.  N.J.S.A. § 17B:26-1 <u>et</u> <u>seq.</u>, by their own language, do not apply to group health insurance plans.

Alternatively, Plaintiff argues that this Court should apply

14

a heightened arbitrary and capricious standard of review because
Liberty both administers the plan and pays for benefits from its
own funds, resulting in an "extreme" conflict of interest.
Specifically, Plaintiff alleges a host of "procedural anomalies"
that warrant a more stringent standard of review.  In particular,
Plaintiff argues that Liberty based its denial of benefits, in
part, on a lack of "objective clinical findings."  However,
Plaintiff alleges that the medical records Plaintiff submitted
were "replete" with objective medical findings.  Plaintiff
further alleges that Liberty "disregarded the opinion of its own
consulting board-certified pain management physician; ignored
[Plaintiff's] medication side effects; performed a results-
oriented vocational evaluation; and relied on erroneous
information regarding [Plaintiff's] functionality."  Liberty
argues that the Court should apply a minimally heightened
standard of review because although Liberty has a conflict of
interest, there is no evidence of procedural irregularities or
overt conflict.

    In Pinto v. Reliance Standard Life Insurance Company, the
Third Circuit reversed a District Court's grant of summary
judgment to the defendant insurance company because the court
found that there were procedural anomalies that should have
resulted in a heightened standard of review in the lower court.
214 F.3d 377, 394 (3d Cir. 2000).  Specifically, the Third Circuit

noted that the defendant in Pinto "reversed its own initial
determination that [the plaintiff] was totally disabled without
receiving any additional medical information;" treated the
medical opinion of the same doctor inconsistently, ignoring the
doctor's opinion that the plaintiff was disabled, but using the
same doctor's opinions to justify denying plaintiff's claim for
benefits; and rejected the opinion of a staff worker who
requested that the plaintiff's benefits resume pending further
evaluation, and instead opting for the "default" of not paying
the plaintiff benefits.  Id. at 393-94.

In her brief supporting Plaintiff's motion for summary
judgment, Plaintiff relies heavily on outdated and non-binding
case law for the proposition that Liberty has to identify
substantial medical evidence to override the opinion of
Plaintiff's treating physicians.  This is simply not a correct
statement of the law. In Black & Decker Disability Plan v. Nord,
the United States Supreme Court stated, "Nothing in [ERISA]
suggests that plan administrators must accord special deference
to the opinions of treating physicians. Nor does [ERISA] impose a
heightened burden of explanation on administrators when they
reject a treating physician's opinion." 538 U.S. 822, 831 (2003).

Another "procedural anomaly" Plaintiff cites is that Liberty
"refused to listen to its own staff members." However, the case
law upon which Plaintiff relies does not support this position.

16

Notably, Plaintiff cites <u>Pinto</u>, in which the Third Circuit found evidence of self-dealing when, among other things, the defendant insurance company adopted the "default" position of denying benefits, even when a staff member recommended otherwise. Plaintiff in this case has no such claim.  Rather, Plaintiff takes exception with the weight Liberty afforded to various evidence. <u>Pinto</u>, 214 F.3d at 393-94.  As previously stated, this is not what the Third Circuit meant when it used the phrase "procedural anomaly."

Finally, Plaintiff finds that Liberty "improperly relied upon erroneous findings of fact about [Plaintiff's] functionality," which Plaintiff implies is a "procedural anomaly." Plaintiff refers to Plaintiff's alleged care of her sibling, search for alternative employment, dog training, and her ability to engage in the "activities of daily living."  To support its argument, Plaintiff refers to a District of Minnesota case, <u>Wuollet v. Short-Term Disability Plan of RSKCo</u>, 360 F. Supp. 2d 994, 1008 (D. Minn. 2005), which is not binding on this court.  Moreover, <u>Wuollet</u> is not on point.  The erroneous facts upon which the defendant insurance company relied in <u>Wuollet</u> originated with a nurse, hired by the defendant, who observed the plaintiff in that case in the plaintiff's home for an hour.  <u>Id.</u> at 999. In this case, the facts Liberty relied upon came from Plaintiff's physicians' records.  This does not rise to the level

of a "procedural anomaly" so as to warrant a more stringent standard of review.

Because Liberty both administers and funds the LTD policy at issue, the Court agrees that it should apply a heightened standard of review.  However, the Court rejects Plaintiff's arguments that the record reflects "procedural anomalies" that would lead the Court to apply a more stringent standard. Plaintiff failed to meet her burden to show any of the suspicious activities that led to the higher standard of review in <u>Pinto</u>. The Court will review Plaintiff's appeal using only a minimally heightened arbitrary and capricious standard of review.

Under an arbitrary and capricious standard of review, a court would overturn an ERISA plan administrator's decision only if the decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." <u>Abnathya v. Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 45 (3d Cir. 1993). Under a minimally heightened arbitrary and capricious standard of review, the Court "should engage in no more than a modicum of additional scrutiny." <u>Lasser v. Reliance Std. Life Ins. Co.</u>, 146 F. Supp. 2d 619, 623 (D.N.J. 2001).[2]

        B.    <u>Motion to Strike</u>

Liberty moves to strike portions of Plaintiff's

---

        [2]    The Court notes that in Liberty's brief supporting its motion for summary judgment, Liberty incorrectly attributed this language to the Third Circuit.

certification, as well as the certifications of her attorney,
from the record.  Specifically, Liberty moves to strike
Plaintiff's undated certification, as well as the August 11, 2006
certification and exhibit of her attorney, both submitted to the
Court in opposition to Liberty's motion for summary judgment.
Liberty also moves to strike the July 6, 2006 certification of
Plaintiff's counsel, which Plaintiff submitted to the Court in
support of her own motion for summary judgment. Liberty argues
that these certifications were not a part of the administrative
record available to the claims administrator at the time Liberty
denied Plaintiff's claim for LTD benefits.  Therefore, Liberty
argues that the Court should not consider this information on
appeal.  In the alternative, Liberty argues that the Court should
strike Plaintiff's certification from the record because the
certification does not indicate that it is a sworn statement, nor
does the certification contain the statutory language required
for the submission of factual materials on a motion for summary
judgment.  Likewise, Liberty argues that the Court should strike
Plaintiff's counsel's certifications from the record because
Plaintiff's counsel has no personal knowledge of the contents of
the certification.

Plaintiff counters that where a plaintiff attempts to
demonstrate bias, conflict of interest, and a denial of due
process on the part of the plan administrator, the Court should

19

consider evidence outside the administrative record. More importantly, however, Plaintiff fails to address Liberty's allegations regarding the certifications' procedural inadequacies in Plaintiff's opposition to Liberty's motion to strike.

The threshold issue is whether the certifications at issue meet the requirements of Federal Rule of Civil Procedure 56(e). Rule 56(e) requires, in relevant part

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed. R. Civ. P 56(e).

1.   *Plaintiff's Undated Certification Submitted in Opposition to Liberty's Motion for Summary Judgment*

Plaintiff's undated certification, submitted to the Court in opposition to Liberty's Motion for Summary Judgment, contains the following language: "I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment." There is no indication that Plaintiff swore to this statement before an officer authorized to administer oaths.

An unsworn, written statement can have the "same force and effect" as a sworn declaration as long as the statement conforms to the requirements of 28 U.S.C. § 1746. This statute requires that the unsworn written declaration include the following

20

language: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," followed by the declarant's signature. 28 U.S.C. § 1746(1). Courts in the District of New Jersey have held that language that omits the phrase "under penalty of perjury" are inadequate under 28 U.S.C. § 1746.  See, e.g., Cooper v. Cape May County Bd. of Soc. Servs., 175 F. Supp. 2d 732, 742 n.6 (D.N.J. 2001) (holding written statements that included the language "I hereby certify that all of the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment,"[3] failed to acknowledge penalty of perjury, and therefore the Court could not consider the statement on summary judgment); U.S. v. Branella, 972 F. Supp. 294, 300 (D.N.J. 1997) (same).

The Court finds that Plaintiff's undated certification, submitted in opposition to Liberty's motion for summary judgment, fails to meet the requirements of Federal Rule of Civil Procedure 56(e).  The Court will strike the statement from the record, and will not consider it for summary judgment.

    *2.    Plaintiff's Counsel's August 11, 2006 Certification Submitted in Opposition to Liberty's Motion for Summary*

---

[3]    This language tracks the requirements of New Jersey Court Rule 1:4-4(b), which clearly is not applicable in the United States District Court.

21

> *Judgment[4] and Plaintiff's Counsel's July 6, 2006
> Certification Submitted in Support of Plaintiff's
> Motion for Summary Judgment*

Plaintiff's Counsel's July 6, 2006 and August 11, 2006 certifications contain the same language as Plaintiff's undated certification discussed in Section II.B.1, <u>supra</u>. For the reasons articulated above, Plaintiff's Counsel's July 6, 2006 and August 11, 2006 certifications likewise fail to meet the requirements of Federal Rule of Civil Procedure 56(e) because they do not reference that the statements are made "under the penalty of perjury," and are not made on personal knowledge. Therefore, the Court will strike Plaintiff's counsel's July 6, 2006 and August 11, 2006 certifications and the attached exhibits from the record and will not consider them on summary judgment.

C.   <u>Summary Judgment</u>

1.   *Review of Adverse Determination*

The Third Circuit stated that the burden of proving an entitlement under a LTD policy lies with the claimant, even where the plan administrator has a conflict of interest. <u>Pinto</u>, 214 F.3d at 392. Moreover, the LTD policy at issue in this case ("Policy") requires the claimant to submit proof of the claim to Liberty. (Def.'s R. Supp. Summ. J. at 63.)

---

[4]   The Court notes that Plaintiff's Counsel's August 11, 2006 certification was submitted with Plaintiff's brief opposing summary judgment. However, the caption of the certification states that it is submitted in support of Plaintiff's motion for summary judgment.

Ultimately, Plaintiff's arguments for this Court to overturn Liberty's denial of LTD benefits are the same as those asserted for a more stringent standard of review, discussed in Section II.A., _supra_.  These arguments center on Plaintiff's perception that Liberty gave too much, or not enough weight, to various medical opinions; Liberty incorrectly relied on notes included in her physician's records that indicated the potential lack of physical impairment; Liberty failed to adequately investigate and clarify the medical records; Liberty failed to take into consideration Plaintiff's subjective complaints of pain; and Liberty failed to consider the side effects of Plaintiff's medications.

Although sympathetic to Plaintiff, this Court returns to the standard of review, and Plaintiff's burden to prove her disability.  Even under the minimally heightened arbitrary and capricious standard, this Court cannot find that Liberty's denial is unsupported by the record.  Moreover, it is Plaintiff's responsibility to prove to the insurance company that she is "disabled" under the terms of the Policy.  Likewise, it is Plaintiff's burden to prove to the Court that she is entitled to LTD benefits.

Although it is true that different medical professionals can come to different conclusions about a patient's prognosis, there is more than enough evidence in the record to justify Liberty's

denial of benefits. Plaintiff's physicians managed her mental impairments with medication and therapy.  With regard to her physical limitations, Plaintiff's job is sedentary in nature, and even if she has a restriction on her ability to sit, her job description is such that she can stand and walk as needed. Liberty never said that Plaintiff does not suffer from chronic pain.  Rather, Liberty concluded that, based on the evidence, Plaintiff's chronic pain does not make Plaintiff disabled. Moreover, her treating physicians noted that Plaintiff engaged in physical activities throughout her disability period that cast doubt on the true nature of her physical limitations.  Finally, Plaintiff's physician's notes provide some evidence that Plaintiff went on disability to avoid an unpleasant work environment.  Liberty was well within their right to take this information from Plaintiff's treating physicians under advisement when rendering their decision.

In her brief supporting summary judgment, Plaintiff states that Liberty failed to investigate factual discrepancies to which Plaintiff alerted Liberty following their initial denial of LTD benefits.  In that letter, Liberty provided specifics of the facts upon which they relied.  To the extent that Plaintiff disagrees with the notations in her own treating physicians' records, it is incumbent upon Plaintiff to clarify those facts and resubmit the records to Liberty for review.  The burden is

not on Liberty to clarify the medical records Plaintiff's treating physicians submit.

For these reasons, the Court finds that Liberty's denial of benefits is supported by the record.  Therefore, the Court will grant Liberty's motion for summary judgment with regard to the review of Liberty's denial of LTD benefits.  Accordingly, the Court will deny Plaintiff's motion for summary judgment on the same.

*2.   Liberty's Cross-claim for Reimbursement*

Liberty also moves for summary judgment on its claim for reimbursement for overpayment of benefits that occurred once Plaintiff received retroactive SSDI benefits.  As with the motion to strike, Plaintiff's counsel completely fails to address this issue in Plaintiff's opposition to Liberty's motion for summary judgment.

Section 502(a)(3)(B) of ERISA permits a fiduciary to bring a civil action "to obtain . . . equitable relief . . . to enforce . . . the terms of the plan . . . ." <u>Sereboff v. Mid Atl. Med. Servs.</u>, 126 S. Ct. 1869, 1873 (2006) (citing 29 U.S.C. § 1132(a)(3)). In 2006, the United States Supreme Court ruled that a fiduciary may seek equitable relief under § 502(a)(3)(B) when, in an effort to enforce the terms of the plan, the fiduciary seeks reimbursement of funds paid to the claimant by way of an equitable lien or constructive trust over funds that are in the

25

claimant's possession.  Id. at 1874. To obtain equitable relief under § 502(a)(3)(B), both the basis for the fiduciary's claim and the relief it seeks pursuant to the terms of the plan must be equitable in nature.  Id. Importantly, a fiduciary cannot impose personal liability on the claimant, as that would be a legal, rather than equitable, remedy.  Id.

In Sereboff, the terms of the ERISA plan at issue required beneficiaries to repay benefits received "as a result of the act or omission of another person or party" from whom the beneficiary recovered via a lawsuit, settlement or otherwise.  Id. at 1875. The Sereboffs received payment from the defendant insurance company, and then recovered from a third party in a lawsuit for injuries.  Id.  The defendant sued to recover the funds it paid the Sereboffs, which the Sereboffs placed in an identified fund under their control.  Id. at 1874.

The Sereboff Court found that the basis for the defendant's claim for reimbursement was equitable in nature, because the funds rightfully belonged to the defendant under the policy's terms.  Id. at 1877.  The Court also found that the relief the defendant sought was equitable in nature because the defendant sought "'specifically identifiable funds . . . within the possession and control of the Sereboffs." Id. at 1874.

Like the plan at issue in Sereboff, the Policy in this case requires claimants to repay overpayment of benefits that results

26

when a claimant receives, among other things, benefits from SSDI. (Def.'s R. Supp. Summ. J. at 64-65.) Liberty produced evidence that shows Liberty paid Plaintiff benefits of $3,938.99 per month between October 1, 2003 and February 13, 2004. Plaintiff admitted that she received retroactive SSDI in the amount of $19,612, which included monthly benefits of $1,594.80 for October, November and December of 2003, as well as $1,610.00 for January and February of 2004.  Liberty states that Liberty overpaid Plaintiff in the amount of $7,089.67 under the terms of the Policy.  Liberty requested reimbursement of $7089.67, and Plaintiff refused.  During discovery, Plaintiff produced bank statements in response to Liberty's request for documents "relating to [Plaintiff's] receipt and use of SSDI benefits." (Def.'s Mot. Supp. Summ. J. at Ex. E.) These bank statements reflect a balance of $10,510.47 as of February 2005 and $5.016.41 as of December 2005.  However, Plaintiff produced a sworn affidavit in support of her own motion for summary judgment, dated August 2006, in which Plaintiff states that she no longer has any of the SSDI back benefits.

Like the claim in <u>Sereboff</u>, the basis for Liberty's claim is equitable in nature.  Under the terms of the Policy, Plaintiff owes Liberty reimbursement for overpayment of benefits.  However, this case differs from <u>Sereboff</u> in that Plaintiff claims she no longer has any of the back benefits from SSDI in her possession.

It is no longer in a specially identifiable fund as the funds were in <u>Sereboff</u>.  Therefore, imposition of liability on Plaintiff for this money would be of a legal nature, resulting in personal liability, and not an equitable remedy.  As a result, the Court denies summary judgment with regard to Liberty's cross-claim for reimbursement.

**III.  CONCLUSION**

For the foregoing reasons, the Court grants Liberty's motion to strike; grants Liberty's motion for summary judgment with regard to review of the adverse benefits determination; denies Plaintiff's motion for summary judgment; and denies Liberty's motion for summary judgment with regard to Liberty's cross-claim for reimbursement of overpayment of benefits.


Dated: <u>2/5/2007</u>          <u>s/Robert B. Kugler</u>
                          ROBERT B. KUGLER
                          United States District Judge